TENSITRON, INC., Plaintiff,

v.

David BROMLEY, d/b/a Electromatic Equipment Company, and Hans Schmidt & Company, Defendants.

No. 62 C 173.

United States District Court
E. D. New York.

Jan. 14, 1966.

Robert E. Burns, New York City (Allan Zelnick, New York City, of counsel), for plaintiff.

Lawrence F. Scinto, New York City (Ward, Haselton, McElhannon, Orme, Brooks & Fitzpatrick, New York City, of counsel), for defendants.

MEMORANDUM

DOOLING, District Judge.

The facts have been separately found and will not be repeated. It has been concluded that certain claims of Saxl patent No. 2,591,724 read on the accused device sold by defendant when the claims are interpreted as embracing slidable mounting as an equivalent of pivotal mounting, and it has also been concluded that plaintiff is not estopped to assert that equivalency by anything done in the course of the prosecution of the patent application. It has, however, been concluded that Claims 2, 3, 5, 6, 7, 8, 10 and 11 of the Saxl patent No. 2,-591,724 are invalid under 35 U.S.C.A. § 103.

The patent is for a three-roller tension meter useful to measure the tension of standing or moving filaments. One class of such three-roller meters measures tension in a filament by recording on a dial or scale the extent to which a calibrated spring yields when it urges one roller (the "sensing" roller) down against the filament as the filament courses over two other ("reference") rollers. Such are the devices of Holt, British Patent No. 199,152, Floyd U. S. Patent No. 1,-647,287 and Sturgess, U. S. Patent No. 2,285,471 (using pivoted blocks and a riser block instead of rollers). Plaintiff's

Saxl patent presents means of facilitating the positioning of a moving filament in a clearance established between the reference rollers and the sensing roller, and of restricting the use of the calibrated spring to the measurement of tension. Saxl mounted the reference rollers on an arcuate guide plate affixed to one end of a pivoted lever, provided a slot in the guide plate midway between the reference rollers and wide enough to be the movement path of the sensing roller, and mounted the sensing roller on a second pivoted lever that permitted it to move up and down in the guide plate slot. Both levers were pivotally mounted in a casing, and the ends of the levers bearing the rollers extended from the casing. Any movement of the sensing roller on its pivot was resisted by a calibrated flat spring; the inner end of the sensing lever was gear-toothed and engaged a gear that turned a dial pointer, registering the filament's deflection of the sensing roller in a scale determined by the flat spring's calibration. The reference-roller lever was held by a strong spring against a stop in the casing, and the lever had a trigger extension by which it could be pivoted against its spring resistance; the strong spring urged the reference lever in a direction opposite to that in which the flat spring urged the sensing roller. When the trigger was pulled, the reference rollers moved away from the sensing roller, engaged the filament and, as the trigger was released, thrust the filament against the sensing roller; the yielding of the sensing roller to that thrust was indicated by the dial pointer.

While Saxl illustrated his invention only in terms of pivotally mounted levers and framed his claims in terms of pivotally mounted reference rollers and of a movably mounted (or pivotally mounted) sensing roller, the idea of his invention is not concerned with modes of motion but with establishing clearance for the accurate measuring of tension by making the two sets of rollers movable both with respect to each other and with respect to their casing. The restricted, arcuate

movement caused by pivotal mounting derives all its value, in Saxl, from the bare fact that it is movement and establishes a clearance, and it derives none of its value from the fact that the path of displacement is an arc. Clearance and only clearance is established by each mode of moving the rollers, the clearance is obtained by manual displacement in each device, and displacement is made against the resistance of a spring that urges the bearing member to a fixed position in the casing. In the small displacement useful to establish clearance for inserting a test filament the curvilinear displacement of the pivoted lever is only immaterially different from the pure translatory displacement of the slide movement of the accused device. On these facts the equivalency of that slide movement to Saxl's pivotal movement is made out. Union Paper Bag Machine Co. v. Murphy, 1878, 97 U.S. 120, 24 L.Ed. 935; Sanitary Refrigerator Co. v. Winters, 1929, 280 U.S. 30, 41–42, 50 S.Ct. 9, 74 L.Ed. 147; Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097; Cf. Gould v. Rees, 1872, 15 Wall. 187, 82 U.S. 187, 192, 194, 21 L.Ed. 39; Gill v. Wells, 1874, 22 Wall. 1, 89 U.S. 1, 28–29, 22 L.Ed. 699.

Saxl presented to the Patent Office claims that read directly on the accused device and, after they were rejected, obtained his present claims, which read on the accused device only by resort to equivalency, for the reference rollers of the accused device are slidably and not pivotally mounted. The cancelled claims were not, however, rejected because they claimed too broadly movability for the lever supporting the reference rollers. Cf. Exhibit Supply Co. v. Ace Patents Corp., 1942, 315 U.S. 126, 136, 62 S.Ct. 513, 86 L.Ed. 736. Apart from grounds of rejection that, in general, revolved around failure to define sufficient structure for operability and failure to define operating relation between structural elements, the basic ground of rejection was that the claims were fully met by Holt, British patent No. 199,152 or were not

patentable over Holt. Saxl's only successful differentiation of Holt was that Holt's reference rollers were not movable with relation to the casing of Holt's meter. Saxl did not seek to differentiate Holt or any other prior art by narrowing his broadly framed descriptions of the reference rollers as pivotally mounted, and narrowing the description of the movability could not have helped to exorcise Holt, which presented both pivotally and slidably mounted sensing rollers in alternative embodiments of his invention. There is no basis in the file history for an argument that Saxl won allowance of his claims only by acquiescing in a rejection based on his claiming movable mounting of the reference-roller member.

 Nonetheless Saxl gave up the quest for claims that included "movable mounting" rather than pivotal mounting. Cf. Schriber-Schroth Co. v. Cleveland Trust Co., 1941, 311 U.S. 211, 220–221, 61 S.Ct. 235, 312 U.S. 654. That, in the circumstances of Saxl's prosecution of his application, does not mean that Saxl's claims are blocked from all resort to the doctrine of equivalency. He certainly cannot claim what could only be reached by the claims he gave up. He can claim what he was granted and its equivalents. The doctrine of equivalents operates in terms of what is in the claim. Yet it would not exist as a doctrine if it did not extend the claim but only read it indulgently. Cf. Keith v. Charles E. Hires Co., 2d Cir. 1940, 116 F.2d 46, 48. That the patentee here may have given up the idea of getting a claim as broad as all means of moving a member and sought rather a claim on a specific mode of moving exhibited by his preferred embodiments does not deprive him of the equivalents of what he sought and was allowed; he cannot claim what he gave up—all modes of movement—but he can treat as an infringer anyone who uses that mode of movement which is—singularly, perhaps—genuinely an equivalent of his specific mode of movement. Cf. Borg-Warner Corp. v. Paragon Gear Works, Inc., 1st Cir. 1965, 355 F.2d 400. There is no "file wrapper estoppel" because the patentee here is not reviving a claim to what he surrendered but is claiming what he was granted in its remedial extension under the doctrine of equivalency. It is not a sufficient test for estoppel that claims not allowed plainly read on the accused device while all allowed claims require resort to an equivalent to show infringement where, as here, the use of the narrower language was not elected as a means of disposing of grounds of rejection advanced by the Patent Office. Cf. International Mfg. Co. v. Landon, Inc., 9th Cir. 1964, 336 F.2d 723, 727; Exhibit Supply Co. v. Ace Patents Corp., 1942, 315 U.S. 126, 136, 62 S.Ct. 513, 86 L.Ed. 736. And the present case is dissimilar in principle to Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 222–223, 61 S.Ct. 235, 312 U.S. 654 where only the claim surrendered contained the particular element the addition of which provided patentable novelty.

 It is on validity that plaintiff's case fails. Saxl's use of movable mounting for both sensing and contact rollers has the evident utility he claims for it, at least in some degree. It presents at best, however, an additional way of accomplishing what Floyd and Sturgess accomplish. Given Floyd, Sturgess and Holt in the prior art, Saxl's patent discloses a workmanlike organization of familiar components and techniques of the tension meter art to make an instrument that employs without increasing the technical resources of the field. Cf. Dempster Brothers, Inc. v. Buffalo Metal Container Corp., 2d Cir. 1965, 352 F.2d 420, 422–423.

It follows that defendant is entitled to judgment. It is, however, concluded that an award under 35 U.S.C.A. § 285 is not warranted by the nature of the case.

The following are the findings of fact and conclusions of law herein:

### FINDINGS OF FACT

1. Plaintiff is a corporation organized under the laws of the Commonwealth of Massachusetts; its principal place of business is at Harvard, Massachusetts.

2. Defendant David Bromley is a citizen and resident of the State of New York and resides in and conducted business at the times in question as Electromatic Equipment Company, in Nassau County in the Eastern District of New York.

3. Hans Schmidt & Company was not served with process and did not appear in the action.

4. Erwin J. Saxl on October 24, 1945, applied for a patent on improvements in a Tension Meter; on about January 26, 1950, Saxl had reasonable assurance that Claims 1 and 7 through 11 of the patent ultimately issued would be allowed; on or about June 11, 1951, Saxl had assurance that all the claims of the patent ultimately issued would be allowed; the formal Notice of Allowance of the patent application issued July 11, 1951.

5. The patent in suit, No. 2,591,724 was issued to Erwin J. Saxl on April 8, 1952.

6. Saxl assigned the patent to his wife by an instrument in writing signed and acknowledged June 1, 1952.

7. By a further unacknowledged instrument in writing dated August 1, 1952, Saxl assigned to his wife and one Frank Leslie Fenwick, Jr., his interest in his United States and foreign patent rights, including U. S. Patent No. 2,591,742, British Patent 663,899, French Patent No. Proisoire 624,596 and pending Canadian and German applications.

8. An agreement made January 12, 1953, signed by Saxl, his wife, Fenwick and the attorney who prosecuted the application for the patent in suit provided for a transfer of the patent to the plaintiff corporation, for Saxl's continuing development work on the patent, and granting Saxl a three year option to buy enough of the stock of the plaintiff so that he and his wife would hold 65% of the stock.

9. Plaintiff was incorporated under Articles of Incorporation executed by Fenwick, Mrs. Saxl and the patent attorney on January 12, 1953; the Secretary of the Commonwealth of Massachusetts received and approved the Articles of Incorporation on February 25, 1953, and issued his Certificate of Incorporation on that day.

10. An involuntary petition in bankruptcy was filed against Saxl in the United States District Court for the District of Massachusetts (No. 99–53) on February 24, 1953, and Saxl was thereafter adjudicated a bankrupt.

11. Saxl did not list the patent in suit as an asset in his bankruptcy proceeding.

12. There is no evidence and no finding is made respecting the disclosure in the bankruptcy proceedings of the matter referred to in findings 6 through 9.

13. Saxl was discharged in bankruptcy on April 21, 1954.

14. By instrument in writing signed and acknowledged July 1, 1957, Saxl assigned to plaintiff the patent in suit and the assignment was recorded in the Patent Office on July 18, 1957 (35 U.S.C. § 261); no other assignment of the patent, earlier or later, was recorded in the Patent Office.

15. During trial Mrs. Saxl signed and acknowledged a confirmatory assignment to plaintiff of all her interest in the patent in suit and in any causes of action for infringement.

16. Except in the present case, and then as a result of the disclosure of data at variance with Saxl's testimony in a pre-trial deposition, the title of plaintiff to the patent and plaintiff's exclusive right to make, use and vend the articles of the patent have not been questioned.

17. Defendant Bromley made commercial sales in the United States commencing in 1958 or 1959 of the accused tension meters (Exhibit 2); such tension meters were manufactured in Germany by Hans Schmidt & Company; defendant Bromley continued to make sales of such tension meters after the present action was commenced.

18. Defendant Hans Schmidt & Company has been advised of the pendency of the present suit; it has consulted its own counsel in Germany about the suit; it has communicated and advised with defend-

ant Bromley about the suit, its merits, and its settlement.

19. Defendant Hans Schmidt and Company has contributed to the expense of the defense of the present suit by allowing defendant Bromley credit in the open account between them for a part of the expenses incurred through a date preceding trial; the credits allowed equalled about 50% to 60% of such expenses.

20. Defendant Hans Schmidt and Company has not expressly agreed to bear the whole expense of defense or to indemnify defendant Bromley; defendant Bromley expects to ask Hans Schmidt and Company for complete reimbursement of expense; Hans Schmidt and Company did not select and does not control defense counsel, and does not control the defense of the action.

21. The plaintiff's patent in suit (the "Saxl patent" or "Saxl"), U. S. Patent No. 2,591,724 relates to a portable device for measuring mechanically the tension in yarn, cord, wire or other filaments whether standing or in linear movement. Tension meters as such are old. The Saxl patent is addressed to improvements in tension meters that would have as advantages (a) simplicity of operation, principally in ease and rapidity of application of the meter to the filament to be measured, (b) accuracy of measurement, and (c) freedom from intrusions into the measuring elements of dust, lint and other foreign substances.

22. Plaintiff charges the accused device (Exhibit 2) with infringement of Claims 2, 3, 5, 6, 7, 8, 10 and 11; Claims 1, 4 and 9 are not claimed to have been infringed.

23. The Saxl patent, in its figures and specification, visualizes determining the tension of a standing or moving filament by measuring the filament's resistance to deflection when, while the filament is passing between two separated "reference rollers," a third "sensing roller," linked to a calibrated spring, is pressed down on the filament midway between the reference rollers; the resistance of the filament to deflection forces the calibrated spring of the sensing roller to yield and the extent of that yield registers the filament's tension. The construction visualizes that the tension will be registered when the filament is deflected in a shallow V, as thus:

A and B are the reference rollers. C is the sensing roller; the calibrated spring of C forces C downward, and the tension of the filament forces C upward.

24. Saxl's construction as illustrated and described, located the two reference rollers on a guide or shield plate on opposite sides of a slot cut in the plate to accommodate movement of the sensing roller up and down between the references rollers. Both the guide plate and the sensing roller were mounted at the ends of levers that operated on pivots; the levers were at right angles to the filament, the guide plate and the plane of rotation of the three rollers, and the levers' up and down pivoted movement was in a plane vertical to the filament. The lever supporting the guide plate was held against one of its limit points by a spring the strength of which would considerably exceed the tension of any filament expected to be measured. The lever supporting the sensing roller was held against one of its limit points by the calibrated spring. The two springs urged their respective levers in opposite directions. The two levers were mounted in a casing and one end of each of the levers extended through a separate slot in the

casing; at its external end one lever carried the guide plate and its reference rollers and the other lever carried the sensing roller. The guide plate and its reference rollers had a trigger grip attached by which the guide plate and rollers could be rotatably moved against heavy spring tension so that the reference rollers were well below the sensing roller; on release of the trigger the reference rollers would be spring urged to a limit point such that the reference rollers passed well above the sensing roller's position when at rest.

25. The Saxl construction, as illustrated and described, contemplated that the user would press the trigger of the tension meter to its limit, place the reference rollers under and just in contact with the filament, and release the trigger so that the reference rollers were pressed to their upward limit of travel by their strong spring. The upwardly urged filament would then engage the underside of the sensing roller and, thrusting upward against it, compress its calibrated spring to a definite point. The lever carrying the sensing roller was geared to a pointer on a dial on the casing; the dial was marked in correspondence with the calibrated spring and as the lever pivoted against the spring in response to the rise of the sensing roller, the pointer would register the amount of the filament's tension on the dial.

26. Claims 1, 4, and 9 are not claimed to have been infringed; Claim 1 is on tension meter in which both the sensing roller and the reference rollers are on pivotally mounted levers and in which the levers have rotation. Claims 4 and 9 include among the elements of the combinations they claim a flange located on the part of the lever carrying the reference rollers that is inside the casing and which operates as a guard closing the trigger slot in the casing against the intrusion of foreign matter.

27. The remaining claims fall into two groups: Claims 2 and 7 present the fewest limiting elements and the claims that follow each add, in the same order, particular specification of (a) the slot in the casing (through which extends the "trigger" or "manually engageable finger") used for moving the lever carrying the reference rollers, Claims 3 and 8; (b) a flat spring as an element of the "spring means" (that yieldingly resists the movement of the lever carrying the sensing roller), Claims 5 and 10; and (c) inclusion among the "contact elements" (hereinabove called "rollers") of "freely rotatable V-shaped pulleys", Claims 6 and 11.

28. The accused device employs a "flat spring" as a spring means (Exhibit 25, Fig. 4, numeral 47), as specified in Claims 5 and 10, and "rotatable V-shaped pulleys" (Exhibit 25, Figs. 1, 6, numerals 20, 21, 24), as specified in Claims 6 and 11; the accused devise has a "slot" in which the thumb grip by which the rod carrying the reference rollers is moved (Exhibit 25, Fig. 3, letter "C"); infringement of Claims 3, 5, 6, 8, 10, and 11 depends on whether the accused device infringes either or both of Claims 2 and 7, and if it does, and if Claims 2 and 7 are valid, infringement of the remaining Claims in their respective trains of claims will follow. [The phrase in Claims 5, 6, 7, 8, 10 and 11 "against the tension of its spring means" is regarded as harmlessly redundant, since in all claims "spring means" "urge" or "press" the pivotally mounted member (carrying the reference rollers) to a "fixed position" and the manually engageable finger or trigger when used to move the pivoted member necessarily moves it "from its fixed position" and "against the tension of its spring means."]

29. The common elements in Claims 2 and 7, both of which are limited to their use in "portable tension meters" are the following (where the claim verbiage differs, the Claim 2 expression is italicized, and the Claim 7 language is enclosed in brackets):

A. a casing

B. a member pivotally mounted in said casing * * *, spring means *pressing* [urging] said pivoting member to fixed position, * * * said pivoted member having a manually engageable *trigger* [finger] extending

from said [the] casing *adapted to move* [for moving] said pivoted member *from its fixed position* against the tension of its spring means *for facilitating receiving* [to facilitate insertion] of the linear element;

(In Claim 7 the language is "a manually engageable finger on said pivoted member" rather than "said pivoted member having a manually engageable trigger," as in Claim 2. The phrase "from its fixed position" is not in Claim 7; its presence and absence do not alter the meanings of the claims.)

C. a *second* member movably mounted in said casing;

D. spring means yieldingly resisting movement of said movable member [C, above] in accordance with *the* tension of the linear element, an indicator on said casing [A], and mechanism connecting the movable *contact* member [C] to the indicator for indicating the tension responsive movement of the movable member [C].

30. The elements common to Claims 2 and 7 do not include the particulars of the contact elements (hereinabove called "rollers"), their location and physical means of cooperating in tension measurement.

31. Claim 2 adds to the combination of Finding 29 and to the description in it of "a member pivotally mounted in said casing" and "a second member movably *mounted in said casing*" the further, broadly described, element—

E. said members having cooperating contact elements adapted to receive a linear element under tension therebetween.

32. Claim 7 deals with the provision of "contact elements" in Finding 29's combination of "a member pivotally mounted in said casing" and "a member movably mounted in said casing," *first*, by specifying the pivoted member as "having" the compound element—

E 1. a guide plate with a slot, said guide plate having spaced contact elements on opposite sides of said slot;

and, *second*, by specifying the movable member as "having" the element—

E 2. a contact element positioned in said slot and normally in alignment with the contact elements of the guide plate, whereby a linear element under tension may be positioned between said guide plate contact elements and said movable member contact element.

Elements E 1 and E 2 of Claim 7 thus claim more narrowly than Element E of Claim 2 what is depicted in respect of the arrangement of the contact element mounting and positioning in Fig. 1, Fig. 2 and Fig. 3 of plaintiff's patent; the patent identifies the guide plate 20, a slot 23, and spaced contact elements 21 and 22 on the pivoted member 16, and a contact element 24 on the movable member 35 positioned in slot 23 in normal alignment with the guide plate contact elements 21, 22.

33. The prior art disclosed the employment in a tension meter of two spaced reference rollers (or other contact elements) and a medial sensing roller (or other contact element) which are movable with respect to each other, are in the same plane when in operating alignment, and which are so mounted with relation to each other as to facilitate insertion of a linear element between the reference and sensing rollers (or other contact elements). See Finding 31, element E, and Finding 32, element E 2. The use of three aligned rollers as such a mechanical shunt [in contrast to use of two-roller devices (e. g., Exhibits 10, 11, 12) which have to be twisted into deflecting engagement with the linear element to obtain a tension reading] is *described and shown in* Holt, British No. 199,152 (1922, 1923), Floyd, U.S. No. 1,647,287 (1924, 1927), Cook, U.S. No. 1,838,299 (1929, 1931) and Sturgess, U. S. No. 2,285,471 (1940, 1942); Cf. Burbank, U.S. No. 1,211,820 (1916, 1917); Marchev, U.S. No. 1,659,919 (1924, 1928).

34. The prior art disclosed the combined use in tension meters of spring means yieldingly resisting movement of a sensing roller (or other contact element) in accordance with the tension of the linear element, an indicator, and mechanism connecting the roller (or other contact element) to the indicator for indicating the tension responsive movement of the roller (or other contact element). See Finding 29, element D. See Holt, Floyd, Cook, Sturgess, Burbank and Marchev, Finding 33, supra.

35. The prior art disclosed the use in tension meters of a casing (Finding 29, element A) and the movable mounting in said casing of a member carrying a sensing roller (or other contact element) (Finding 29, element C). See Holt, Sturgess, and Marchev, Finding 33, supra.

36. The prior art disclosed the use in tension meters of methods of mounting the spring means for measuring the deflection of a sensing roller (or other contact element) (as in element D, Finding 29) in which compression and relaxation of the spring element of the spring means was employed only in measuring tension (see Floyd and Sturgess, Finding 33, supra) and not to perform work in moving the sensing and reference rollers (or other contact elements) relatively to each other during insertion and withdrawal of the linear element before and after tension measurement.

A. Contrast Holt, Finding 33, supra, in which the calibrated springs 11, Fig. 2, and 43 Figs. 5, 8 must be compressed (numeral 11) or stretched (numeral 43) beyond the final point of equilibrium—during—measurement in order to engage the linear element between the reference rollers 26 and the sensing roller 12. See Holt, p. 5, 11. 15–18, p. 5, 11. 101–109, 116–120.

B. In Floyd (Finding 33, supra) note that force is exerted on spring 26, 27, 28 only so long as the linear element is simultaneously in tangential (or peripheral) contact with the two reference rollers 16 and sensing roller 17; when that simultaneously tangential contact is lost, levers 11 and 12, held in fixed relation to each other at lip 33 by the extension of spring 26, rotate freely in relation to lever 10 on pivot bearing-pin 13 during insertion and withdrawal of the linear element. Tension is measured by Floyd only when the levers 20 and 21 are squeezed together manually until indicator point 31 reaches a point on scale 30 equal to the thickness of the linear element; the force measured on scale 23 by pointer 24 is the squeezing force and is equal to the tension of the linear element.

C. In Sturgess (Finding 33, supra; Exhibit 13) the calibrated leaf-spring 6 of Figs. 2, 5 is deflected only when the sensing contact element 5 is in contact with the linear element the tension of which is being measured. The deflection of leaf 6, multiplied along rigid arm 19, under tension of the linear element is transmitted to the dial indicator 3 through screw 20, lever 39 pivoted at 39, link 36 joining lever 39 to lever 35 and pivoted gear sector 33 to gear 34 actuating shaft 32 on which dial indicator 3 is mounted. The turning of the trigger and cam lever 8, pivoted at 24 and equipped with roller 25, from the position indicated by the dashed lines to the position indicated by solid lines in Fig. 2, supplies overpowering force to leaf-spring 6 and rigid arm 19 so that a range of tensions presented by linear elements, inserted between reference contact elements 4 and sensing contact element 5 when the trigger is in dashed line position, may be measured through the deflection of leaf-spring 6. See Finding 29, elements B, C, D co-acting.

37. The prior art disclosed the combinations of

A. The elements of Finding 29 A, C and D and Finding 31 E with reference rollers (or other contact elements) immovably mounted on the casing (Finding 29, element A), as in Holt, and Sturgess; and, in such combination, the use of a flat spring as part of the "springs means" of measuring tension (Finding 28, Finding 29, element D) and the use of rotata-

ble V-shaped pulleys (Finding 28) as in Holt;

B. The elements of Findings 29 A, C and D and Finding 32, element E 2 with reference rollers immovably mounted on the casing (Finding 29, element A) in the manner of Finding 32 element E 1 as in Holt [reference rollers 26 are mounted on plate 39 which has a slotted tongue that is bent over and returns (393) between rollers 26 and presents a slot 394 through which roller 12 moves; the returned slotted tongue 393 of reference-roller-bearing plate 39 is a guide to lead the linear element into the grooves of rollers 26]; in such combination of Holt a flat spring is not used (Finding 28); in such combination of Holt V-shaped pulleys are used (Finding 28); and in such combination of Holt a casing slot and trigger (or finger engageable means) for moving a contact element are used (Finding 28) but the casing slot and trigger are related to moving the sensing roller and not the reference rollers.

38. The prior art did not disclose or describe any tension meter for measuring the tension in a standing or moving filament in which both the member carrying the sensing roller (or other sensing contact element) and the member carrying the reference rollers (or other reference contact elements) were mounted movably both as to each and as to a common casing and have cooperating contact elements (Finding 29, elements A, B and C in cooperating relation and Finding 31, element E).

A. Floyd (Finding 33, supra) presented reference rollers 16 on arm 10, 21 and sensing roller 17 on arm 11 and arms 10 and 11 are movable with relation to each other; arms 10 and 11 are each separately movable with relation to arm 12, 20; Floyd is not in a casing and no spring means other than the calibrated spring 26 relates arm 12, 20 either to arm 10, 21 or arm 11.

B. The reference contact elements 4 in Sturgess (Finding 33, supra) are not relevantly movably mounted in relation to the casing; their pivotal mounting at the points 10 equates them with immovably mounted rollers.

39. The prior art did not disclose or describe any tension meter for measuring the tension in a standing or moving filament in which the cooperating contact elements adapted to receive a linear element between them (Finding 31, element E) are mounted on members separately movable with relation to each other and a common casing, and in which

A. a spring and trigger are united to give the reference-roller member a normally fixed position and a means of moving the rollers to insertion position (see Finding 29, element B); or

B. the reference rollers are mounted on a guide plate on one of the movable members on opposite sides of a slot in the guide plate that accommodates the sensing roller (Finding 32, elements E 1, E 2); or

C. the combination includes both of the constructions referred to in subparagraphs A and B of this Finding 39.

40. The prior art did not disclose or describe the combinations of Finding 38 or 39 in which the additional limitations described in Finding 28 were present.

41. The invention claimed by plaintiff in Claims 2, 3, 5, 6, 7, 8, 10 and 11 of the Saxl patent was not identically disclosed or described in any article in public use or in any patent or printed publication before Saxl made his invention.

42. The prior art patents the disclosures of which most nearly approach plaintiff's patent are

A. Holt, British No. 199,152;

B. Floyd, U.S. No. 1,647,287; and

C. Sturgess, U.S. No. 2,285,471.

Holt and Floyd were cited in the Patent Office as were Burbank and Cook. Sturgess was not cited in the Patent Office.

43. In Saxl's application his original Claims 7 through 20 and 22 were rejected for reasons not presently relevant.

A. Original Claims 1 through 5 and 21 and 23 included members carrying

sensing and reference contact elements and described the elements as movable with relation to each other or described the member carrying the sensing element as movable with relation to the reference elements; none of the claims described the movable member as pivoted or as pivotally mounted or movable; none of the claims distinctly described the reference rollers or their supporting member as being movable with relation to the casing. (As to Claim 3, last clause, it was not read as having that meaning, see Ex. N, p. 33 11. 16–18, Tr. 454–455.)

(i) Original Claims 1, 2, 4, 5, 21 and 23 (and also claims 11 and 20) were rejected as fully met by Holt, and the Examiner directed attention to Figs. 4–8 of Holt, in which the sensing roller is pivotally mounted; Figs. 1–3 of Holt deal with a tension meter in which the sensing roller is slidably mounted and the reference rollers are mounted on an immovable plate 24 in which are formed lateral (243) and forwardly projecting (244) wings functioning as a yarn guide (Holt, P. 4, 1. 115 to p. 5, 1. 5).

(ii) Original Claim 3 (with six other Claims, 7, 8, 9, 13, 14 and 18, referring to structure in which only one lever is described) was rejected as not patentable over Holt.

(iii) The rejection of Claims 1 through 5, 21 and 23 by reason of Holt was not based on a failure of the Claims to limit the movability of the movable lever to pivotal movement; such a limitation would not have avoided Holt Figs. 4 to 8. The natural inference from Ex. N, p. 33, 11. 10 through 18 (including the citation of Cook U.S. No. 1,838,299 as fully meeting Claims 1 and 2) is that the ground of rejection was that the Claims, not being limited to structures in which the separate levers bearing sensing and reference rollers were movable both with relation to each other and with relation to their common casing or frame, necessarily read on Holt's structure, and would not be patentable over Holt if they made the reference rather than the sensing lever movable (Claims 7, 8, 9) or specified only detail of a movable sensing lever (Claims 13, 14, 18) and failed to specify the structure by which an encased movable sensing lever (as in Claims 3, 13, 14 and 18) could be so moved as to facilitate insertion of the filament being tested.

B. Original Claim 6, was not rejected, was never amended, and was allowed as Claim 1 of the issued patent; it claims (among other limitations), in a tension meter, pivotal mounting in the casing of both a lever carrying the sensing roller and a second lever, also pivotally mounted, carrying a shield on which are spaced-aligned reference rollers.

C. In original claims 7 through 10 the lever carrying the reference rollers was described as pivotally mounted in a casing; the lever carrying the sensing roller was not referred to in any of Claims 7 through 10.

D. In original claims 11 through 18 the lever carrying the sensing roller was described as pivotally mounted in a casing; the lever carrying the reference rollers was not referred to in any of Claims 11 through 18.

E. Original Claims 19 and 20 did not refer to the levers or members carrying the sensing and reference rollers.

F. Claim 22 included reference to two contact devices one of which is "movable" under the tension of a linear element. (Claim 22 was not rejected in the first office action.)

44. In response Saxl presented Claims 24 through 33; Claims 24 through 29 described both the sensing and reference rollers as pivotally mounted and Claims 30 through 33, specifying a slotted guide plate, did not describe the guide plate or its reference rollers as movably or pivotally mounted but specified pivotal mounting for the sensing roller. In presenting the claims, Saxl differentiated the Cook and Holt devices on the ground (inter alia) that their reference rollers were fixed.

45. In the second office action Claims 30 through 33 were rejected as readable directly on Holt and Claim 31, specifying a flat spring, was rejected as not patent-

able over Holt's coil spring 43 (Figs. 5, 8). Claim 22 was rejected for an irrelevant reason and without reference to the nature of the movement of its movable lever. In the second office action Claim 6 was allowed.

46. In response Saxl presented Claims 34 through 44 as a rewriting of Claim 22 as 34, an amendment of Claims 24 through 29 as Claims 35 to 39, and a rewriting of old Claims 30 through 33 as Claims 40 through 44 incorporating and adding to the subject matter of Claims 35 through 39. In Claims 35 through 44 the member carrying the reference rollers is pivotally mounted and the member carrying the sensing roller is described as movably mounted. Claim 34 described the sensing roller as movably mounted and was not limited to reference rollers located on a movably mounted member.

47. The third office action rejected Claim 34 for an irrelevant reason, indicated that Claims 40 through 44 could be rendered allowable by amendment and rejected Claims 34 through 39 for failure to recite sufficient structure. After Saxl further amended Claims 34 through 44, the fourth office action rejected Claim 34 as rewritten to claim a tension meter in which only the sensing element was movably mounted (Ex. N, pp. 47–48, as changed in handwriting). Claim 34 was rejected as not patentably defining over Holt in providing that the spring of its sensing roller member should urge the sensing roller into lateral alignment with the reference rollers rather than, as in Holt to a position beyond the rollers (See Holt, Fig. 10).

48. Saxl did not obtain the allowance of the claims of plaintiff's patent by limiting the claims to pivotal mounting of the member carrying the reference rollers (or contact elements); allowance of Claims 2 through 11 followed the cancellation of the only claims that used the more general expression movably mounted; the course of the prosecution of the application was such that the Patent Office was never presented with the question whether any or all of the claims finally allowed would have been allowable if "movably mounted" were substituted for "pivotally mounted" in each of Claims 2 through 11; and there are no means of determining whether substitution of "movably mounted" for "pivotally mounted" in each of Claims 2 through 11 would have facilitated or inhibited allowance of the claims.

49. Claim 7 of plaintiff's patent does not read on the accused device (apart from the matter of the pivotal mounting of the member carrying the reference rollers) for the reason that although the accused device is a portable tension meter, has a casing, and has a member movably mounted in said casing, it has not a guide plate with a slot which guide plate has spaced contact elements on opposite sides of the slot and in which slot the sensing element is movably positioned; the accused device has a support strap formed with a channel, said support strap having spaced contact elements (the reference rollers) on opposite sides of said channel, and in which channel the sensing element is movably positioned. The guide plate and slot construction of Saxl as included in Claim 7 relates to specific structure characterized by its uniting of the support, filament positioning and sensing-roller-accommodation functions that the accused device separates between its channeled support strap (Ex. 25, Fig. 2, numeral 20) and the guard-guide affixed to the casing (Ex. 25, Figs. 1, 2, letter G).

50. The accused device does not infringe Claim 7, 8, 10 and 11 of plaintiff's patent No. 2,591,724.

51. The accused device infringes Claims 2, 3, 5 and 6 of plaintiff's patent No. 2,591,724 if, and only if, the slidable mounting in the accused device of the member bearing the reference rollers is an equivalent of the pivotal mounting of the member bearing the reference rollers in claims 2, 3, 5 and 6.

A. The accused device is a portable tension meter 10 (numbers refer to Ex. 25; the numbers of Ex. 25 are, generally, those of the Figures of the Saxl patent) for measuring a linear element,

and it has a casing 11 (Finding 29, element A).

B. It has a member 16 movably mounted in said casing, spring means 27 pressing or urging said movable member to a fixed position 34, * * * said movable member having a manually engageable trigger 31 extending from said casing (or from a slot C in said casing) adapted to move said movable member from its fixed position against the tension of its spring means 27 for facilitating receiving of the linear element (Finding 29, element B).

C. It has a second member 35, 38 movably mounted in said casing (Finding 29, element C).

D. It has spring means 47 yieldingly resisting movement (at 54) of said movable member [C above] in accordance with the tension of the linear element, an indicator 15 on said casing and mechanism (Ex. 25, Figs. 5–8) connecting the movable contact member 24 to the indicator, for indicating the tension responsive movement of the movable member (Finding 29, element D).

E. It has two movable members 16, 38 which have cooperating contact elements 21, 22, 24 adapted to receive (or engage) a linear element under tension therebetween (Finding 31, element E).

F. The accused device has, in addition, the slot (C) of Claim 3, the flat spring 47 of Claim 5, and the V-pulleys 21, 22, 24 of Claim 6.

52. The slidable mounting of the member bearing the reference rollers in the accused device is an equivalent of the pivotal mounting of the member bearing the reference rollers as claimed in Claims 2, 3, 5, and 6 of plaintiff's patent.

A. The function of the movable mounting of the member bearing the reference rollers is to enable the user of the tension meter to move the reference roller away from the sensing roller so that a filament can be inserted in the clearance so brought about. The function is performed by both constructions, that of the claims of plaintiff's patent and that of the accused device, as the sole objective of the movable mounting in each construction.

B. The two constructions establish clearance between the rollers

(i) by moving the rollers apart against spring resistance that is greater than any tension element resistance that can be measured by the spring means linked to the member bearing the sensing roller,

(ii) by so restricting the clearance established between the rollers that the arcuate displacement effected by the pivotally mounted lever of the claims of plaintiff's patent does not cause a misalignment or a functionally significant departure from the right-line displacement effected by the slidable mounting of the member in the accused device, and

(iii) by limiting the clearance that can be established between the rollers to that permitted by the maximum travel of the manually engageable trigger in the trigger slot.

C. The two constructions return the member bearing the reference rollers to fixed position by releasing the pressure exerted on the manually engageable trigger.

D. The difference in the class of motion employed and the related difference in the mechanical means of translating the manual force exerted on the trigger into that motion are not physically or operably significant in view of the limited travel of the reference rollers and the indifferent suitability of the two motions to the result sought.

E. Pivotal mounting is not employed in Saxl as a means of achieving arcuate movement as a specific desideratum, but as a convenient way to obtain a displacement for clearance that would be equally useful whether it was translatory or shallowly arcuate displacement, provided the displacement was compatible with the mode of displacement of the sensing roller.

53. Claims 2, 3, 5 and 6 of the Saxl patent differ from the combination exhibited in the Holt patent (Exhibit F)

in that Saxl positions the reference rollers (rather than the sensing roller) on the trigger-fitted lever and does not immovably affix the reference roller bearing pins to the casing and Saxl restricts the operating movability of the sensing roller to movability against a yielding spring in response to the tension of the linear element; and by these structures, Saxl introduces the idea of providing reference and sensing rollers that are movable both with respect to each other and with respect to their common casing.

54. Claims 2, 3, 5 and 6 of the Saxl patent differ from the combination exhibited in the Sturgess patent (Exhibit G) in that Saxl's means of establishing clearance between the sensing and reference rollers is to install the reference rollers on a movable member provided with a manually engageable trigger rather than by providing, as does Sturgess, a manually engageable lever or trigger (Ex. G, p. 1, Col. 2, 1. 7) pivotally mounted on the casing, which moves the sensing contact element and the spring means that is responsive to the tension of the linear element into and out of operating engagement with the linear element; in so doing Saxl introduces the idea of reference and sensing contact elements that are movable both with respect to each other and with respect to their common casing.

55. Claims 2, 3, 5 and 6 of the Saxl patent differ from the combination exhibited in the Floyd patent (Exhibit D) in that Saxl includes a casing and the lever bearing the reference rollers is manually engageable and is pressed or urged by spring means to a normally fixed position against a stop on the casing rather than, as in Floyd, omitting the casing and permitting the manually engageable lever carrying the contact rollers to pivot freely with relation to the manually engageable member to which the lever carrying the sensing roller is movably related by spring means responsive only to the tension of a linear element. Saxl introduces the idea of adding to the provision of reference and sensing rollers that are movable both with respect to each other and with respect to a common third member (Cf. Ex. D., Figs. 1, 2, numerals 12, 21) the further provision of spring means by which the member bearing the reference rollers is urged to a fixed position in relation to the third member, which, in Saxl, is the casing.

56. Saxl's inventive concept in Claims 2, 3, 5 and 6 comprised an idea of means (in an encased mechanical tension meter using a mechanical shunt) of securing superior facility in inserting a linear element to be tested between sensing and reference rollers and of securing more accurate tension measurement by mounting the sensing and reference rollers on separate members that would be movable with respect to each other and with respect to their casing, the reference rollers being manually movable and the sensing roller being movable only in response to the linear tension to be measured. In Claims 2, 3, 5 and 6 the idea of means is claimed in instrumental embodiments with varying particulars of structure. See Finding 29, 31, 32.

57. The differences between the subject matter sought to be patented in Claims 2, 3, 5 and 6 and the prior art are such that the subject matter as a whole would have been obvious at the time Saxl's invention was made to a person having ordinary skill in the tension meter art.

A. The prior art taught three different methods of facilitating insertion of the linear element, (i) Floyd's, which is the same as Saxl's in abstract mechanical principle, (ii) Sturgess', which reached the result by supplying a pivoted cam, lever and trigger arrangement to move the sensing contact element and its spring means as an integral subcombination, and (iii) Holt, which used Saxl's method in reverse and at the theoretical cost of diminishing accuracy of measurement.

B. Floyd and Sturgess offered structure which met Holt's theoretically disadvantageous double use of the calibrated spring as a trigger spring.

**470**

C. The utility of movable mounting of members bearing contact elements to facilitate insertion of the linear element and to isolate the tension measuring spring was amply taught by the prior art, and to apply the lesson to both sets of contact elements rather than to one did not present patentable difference from the prior art.

58. Claims 7, 8, 10 and 11 do not present patentable difference from the prior art for the same reasons that apply to Claims 2, 3, 5 and 6; the guide plate element, in view of Holt, does not contribute patentable difference.

59. Hans Schmidt & Company acted as a sales agent of plaintiff and received from plaintiff examples of plaintiff's patented tension meter before it devised the accused instrument; there is no evidence that it received or used any detailed drawings or confidential manufacturing information from plaintiff or that its instrument was designed as a direct plagiarism of plaintiff's devices.

60. There is no satisfactory evidence that and it is not found that Hans Schmidt & Company received any example of the experimental instrument, Exhibit 14, or any photograph of it, and there is no evidence and it is not found that Hans Schmidt & Company used an example or photograph of Exhibit 14 in developing the accused device.

## CONCLUSIONS OF LAW

1. Claims 2, 3, 5, 6, 7, 8, 10 and 11 of U. S. Patent No. 2,591,724 are invalid.

2. Claims 2, 3, 5 and 6 of U. S. Patent No. 2,591,724 read on the accused device, Exhibit 2, and, if the Claims were valid, it would infringe each of them.

3. The slidable mounting of the member bearing the reference rollers in Exhibit 2 is an equivalent of the "member pivotally mounted in said casing" called for by Claims 2, 3, 5 and 6 of U. S. Patent No. 2,591,724.

4. Plaintiff is not estopped to assert the equivalency described in Conclusion 3.

5. Claims 7, 8, 10 and 11 of U. S. Patent No. 2,591,724 do not read on the accused device.

6. Defendant is entitled to judgment.

The Clerk is directed to enter judgment that plaintiff take nothing, that the action be dismissed on the merits, and that defendant recover costs, as taxed by the Clerk.